IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA 23-853

Filed 7 May 2024

Alamance County, Nos. 20 JA 46, 20 JA 155, 20 JA 156

IN THE MATTER OF:

M.G.B., T.J.B., H.E.D.,

Juveniles.

Appeal by Respondent Grandmother from Order entered 2 June 2023 by Judge Larry D. Brown, Jr., in Alamance County District Court. Heard in the Court of Appeals 2 April 2024.

*Jamie L. Hamlett for Petitioner-Appellee Alamance County Department of Social Services.*

*Parent Defender Wendy C. Sotolongo, by Assistant Parent Defender Jacky L. Brammer, for Respondent-Appellant Grandmother.*

*Matthew D. Wunsche for Guardian ad Litem.*

HAMPSON, Judge.

**Factual and Procedural Background**

This case arises from Respondent-Grandmother's (Grandmother) appeal from the trial court's Permanency Planning Order ceasing reunification efforts and endorsing a primary plan of adoption with a secondary plan of guardianship. The record reveals the following:

In 2020 Holly, Thomas, and Mary,[1] respectively four years old, three years old, and an infant at that time, were originally adjudicated neglected due to their mother's substance abuse and domestic violence between their parents. Grandmother is the paternal grandmother of the children. Following the original adjudication, the trial court granted Grandmother full legal and physical custody of Thomas. In 2021, the trial court granted Grandmother and the children's father (Father) joint custody of Holly and Mary. When granting custody, the trial court found that Grandmother had been essentially the children's parent for the majority of their lives and had a strong bond with her grandchildren. The children lived in Grandmother's home with Father and their paternal great uncle (Uncle).

In July 2021, Holly began experiencing discomfort and itching around her stomach, vaginal discharge, and the frequent need to urinate. On 4 August 2021, Holly tested positive for gonorrhea. Father subsequently tested positive for gonorrhea. Father denied allegations of sexual abuse, attempting to explain Holly's infection by speculating that transmission could have occurred through a towel or toilet seat. On 7 August 2021, the Alamance County Department of Social Services (DSS) received the report of Holly's positive test and gave Grandmother the option for the children to stay in the family home only if Father and Uncle would not be present. Grandmother had the children placed with a family friend because she did

---

[1] The juveniles are referred to by the parties' stipulated pseudonyms.

not want Father or Uncle to be "without entertainment" and "without cable."

Grandmother denied the possibility of sexual abuse. On 9 August 2021, without consulting DSS, Grandmother picked the children up from the family friend and took them to UNC Hospital for medical testing. She told medical staff she wanted the children tested for "venereal diseases" because she believed Holly's gonorrhea test was inaccurate and she wanted to clear the names of the men in the household.

During this examination, Holly presented with "redness, swelling, and abnormal discharge" in the vaginal area and again tested positive for gonorrhea. Mary also presented with abnormal discharge, but neither she nor Thomas tested positive for any sexually transmitted diseases. After the examinations, DSS instructed hospital staff to release the children to the family friend, not Grandmother, who had become uncooperative and was detained by UNC police.

On 10 August 2021, DSS filed petitions alleging the children were neglected juveniles and Holly was an abused juvenile. The petitions alleged Grandmother was "persistent that nobody hurt the children and was in denial regarding [Holly] having [g]onorrhea." The petitions further detailed DSS's concerns that Grandmother was "not placing the physical or emotional well-being of the juveniles first" and that the children were "at risk of significant emotional and/or physical harm" if they were returned to Grandmother's care.

Holly submitted to a forensic interview in August and a subsequent Child Medical Evaluation in September 2021. During these interviews, she stated "Daddy

hit me" and pointed to her vaginal area when asked where he hit her. She also stated that her father had touched her with his "ding ding," and that he had touched her genitals.

The trial court adjudicated all three children neglected and Holly abused in an order filed 16 February 2022.[2] Grandmother testified at the adjudication hearing that she believed that Holly had contracted gonorrhea from a toilet seat or towel and that she did not believe that Father had abused Holly. Based on expert testimony the trial court rejected Grandmother's explanations for Holly's contraction of gonorrhea, finding that Holly had been sexually abused by Father.

The trial court placed the children in DSS custody. It ordered monthly visitation with Grandmother and instructed her not to speak with the children about the issues involved with the case. The trial court did not at this time order Grandmother to participate in treatment or parental education.

That same month DSS developed a case plan and visitation plan for Grandmother. In the case plan, DSS requested that Grandmother obtain a mental health assessment, refrain from using illicit substances, and attend sex abuse classes. Grandmother signed the visitation plan but refused to sign her case plan as she did not believe she had done anything wrong. She completed the Darkness to Light online

---

[2] The previous appeal in this case, *In re M.G.B.*, 287 N.C. App. 694, 883 S.E.2d 226, 2023 WL 2126139 (2023) (unpublished) addressed Father's appeal of the adjudications of Thomas and Mary. We affirmed the trial court's adjudication that they were neglected.

sexual abuse class on 22 March 2022, but she told social workers she had not learned anything because the course did not contain information that was new to her. Grandmother's visitation with the children during this period went well. The social workers noted that she brought them food and gifts, that she interacted well with the children, and the children seemed to love Grandmother.

On 30 March 2022, Grandmother received a psychological assessment, performed by her own therapist at the UNC Health Pain Management Center. As part of this assessment, the therapist addressed various questions provided by DSS. The assessment notes that Grandmother suffers from depression and anxiety and, though she has a history of sexual trauma and was likely triggered by Holly's diagnosis, the therapist did not believe her psychological disorders impacted her ability to care for the children. However, she did note her belief that Grandmother's trust in her son impacted her ability to examine facts. The report also notes that Grandmother was "defensive," felt that she was the victim in this situation, and continued to believe that Holly had contracted gonorrhea through contact with a toilet seat. The therapist recommended that Grandmother continue working with her via outpatient therapy sessions.

The trial court held a permanency planning hearing on 13 April 2022. It found that Grandmother "continues to deflect and minimize," "support[s] her son's narrative" and "assert[s] herself as the victim." At the hearing she "verbally attacked and blamed" the social worker involved with the children's removal, stating that he

was the reason the children were removed.

The trial court reviewed the psychological examination report and found concerns regarding its usefulness. Among the trial court's concerns were that the report had been conducted by a pain management clinician, focused primarily on pain management, and was performed by a clinician who had a longstanding relationship with Grandmother. The trial court was also concerned that the therapist did not have sufficient information to make the assessment: she only spoke with Grandmother and did not indicate that she had reviewed any documentary evidence regarding the case. Grandmother did not inform the therapist that her son had been criminally charged or that the trial court had found that Holly had contracted gonorrhea through sexual contact and, instead, allowed her to believe an investigation was pending, possibly impacting her ability to make an educated diagnosis and treatment plan given Grandmother's continuing denial that sexual contact had occurred.

The trial court found that Grandmother was acting in a manner inconsistent with the health and safety of the juveniles, but was making sufficient progress under her plan.[3] It endorsed a primary plan of reunification and a secondary plan of guardianship, and ordered that Grandmother attend sex abuse classes or support groups, "receive an assessment to address issues of sexual abuse concerns," receive

---

[3] Mother and Father remained parties to the juvenile case and at this and subsequent permanency planning hearings were found to have made insufficient progress until their parental rights were terminated in April 2023. Neither are party to this appeal.

therapy on how to parent a child who has been sexually abused, and that she receive a new psychological evaluation.

Between this and the next permanency planning hearing, Grandmother received two psychological evaluations, each recommending, among other things, that Grandmother incorporate Dialectical Behavioral Therapy ("DBT") into her treatment. She visited the children monthly, as allowed by the trial court, bringing them food and toys. She continued to deny that sexual abuse had occurred, including reporting to a social worker that she did not believe her son had done anything wrong.

A second permanency planning hearing was held on 30 November 2022. The court found that Grandmother remained an unsafe caretaker for the children because she continued to refuse to acknowledge the likelihood that her son assaulted Holly. The court ordered a primary plan of adoption and a secondary plan of reunification. The trial court ordered Grandmother cooperate with the recommendations of the two new evaluations and again ordered her to attend sex abuse classes or support groups.

Between that hearing and the permanency planning hearing from which this appeal arises, held on 26 April 2023,[4] Grandmother did not undergo DBT as ordered. She testified that she contacted numerous providers but was unable to pay for their services as they did not accept her health insurance. She initially rejected offers from DSS to assist in paying for her treatment before ultimately attending two intake

---

[4] Mother's and Father's parental rights were terminated on 21 April 2023.

sessions with a therapist. This therapist determined that Grandmother did not require DBT services, but made that assessment without reviewing prior assessments, documentation, or court filings, relying only on information provided by Grandmother.

At the hearing, Grandmother testified that she continued to believe Holly had contracted gonorrhea through contact with a toilet seat and that if a jury convicted her son she would still not believe he had harmed Holly.

The trial court found that Grandmother failed to obtain DBT services, had not participated in educational training, parenting courses, or support groups to help her parent a child who had been neglected or sexually abused, and that her refusal to accept that Father had abused Holly restricts her ability to render safe and appropriate decisions on behalf of the minor children. The court found that Grandmother had failed to make progress in a reasonable period of time and ordered a primary plan of adoption and secondary plan of guardianship, ceased reunification efforts with Grandmother, and eliminated visitation. Grandmother filed timely written notice of appeal.

## Issues

Grandmother identifies a number of issues for our review. Accordingly we address: (I) the trial court's findings of fact regarding aspects of Grandmother's progress on her case plan; (II) the trial court's alleged misapprehensions of law in finding an inapplicable ground for termination and placing the burden of proof upon

Grandmother; (III) the trial court's conclusion that reunification should be removed from the permanent plan; (IV) whether the guardian ad litem properly discharged its duties; and (V) whether DSS made reasonable efforts toward reunification.

## Analysis

Following a juvenile adjudication and initial disposition, the trial court holds a permanency planning hearing within 90 days and then subsequent hearings at least every six months. N.C. Gen. Stat. § 7B-906.1(a) (2023). At each permanency planning hearing, the trial court must adopt concurrent primary and secondary permanent plans, most commonly selecting from among reunification of the juvenile with their parents, adoption, guardianship with relatives or others, or custody to a relative or other suitable person. *In re J.M.*, 384 N.C. 584, 593, 887 S.E.2d 823, 829 (2023); N.C. Gen. Stat. 7B-906.2. Reunification must be the primary or secondary plan unless the permanent plan has been achieved or the trial court (1) made written findings specified by N.C. Gen. Stat. § 7B-901(c) at the initial disposition hearing; (2) made written findings under 7B-906.1(d)(3) at a review hearing or earlier permanency planning hearing; or, as in this case, (3) makes written findings in the permanency planning order that "reunification efforts clearly would be unsuccessful or would be inconsistent with the juvenile's health or safety." N.C. Gen. Stat. § 7B-906.2(b). The written findings are not required to track the statutory language verbatim, but they "must make clear that the trial court considered the evidence in light of whether reunification would be [clearly unsuccessful] or would be inconsistent

with the juvenile's health, safety, and need for a safe, permanent home within a reasonable period of time." *J.M.*, 384 N.C. at 594, 887 S.E.2d at 830 (quoting *In re H.A.J.*, 377 N.C. 43, 49, 855 S.E.2d 464, 470 (2021)).

In this case, the trial court found that reunification efforts with Grandmother "clearly would be unsuccessful and would be inconsistent with the juveniles' health or safety." In support of this conclusion, it found that Grandmother had failed to meet the children's needs by not participating in services to help her address Holly's sexual abuse, refusing to believe abuse had taken place, failing to cooperate with or follow recommendations of her psychological evaluations, and engaging in inappropriate conversations in the presence of the children.

Grandmother argues that she made sufficient progress on her case plan such that the trial court's conclusion that reunification would clearly be unsuccessful is unsupported. In doing so she challenges the trial court's conclusions, as well as a number of individual factual findings.

When reviewing a permanency planning order, we examine "whether there is competent evidence in the record to support the findings [of fact] and whether the findings support the conclusions of law." *In re A.P.W.,* 378 N.C. 405, 410, 861 S.E.2d 819, 825 (2021) (citing *In re H.A.J.*, 377 N.C. at 49, 855 S.E.2d at 469). "The trial court's findings of fact are conclusive on appeal if supported by any competent evidence." *Id.* Uncontested findings of fact are binding on appeal. *Id.* "The trial court's dispositional choices—including the decision to eliminate reunification from the

permanent plan—are reviewed for abuse of discretion." *Id.* at 410, 861 S.E.2d at 825-26.

I.      Factual findings

Grandmother contests a significant portion of the trial court's findings of fact but groups her arguments into five primary categories. She argues that the evidence does not support the trial court's findings that she: (1) did not complete DBT therapy or mental health services; (2) did not complete a sex abuse education class; (3) cannot see reality, cannot admit her son abused Holly, and prioritizes herself and her son over her grandchildren; (4) has not disengaged from her son; and (5) acted inappropriately during visitation. Grandmother argues that she "basically complied" with the court's orders to complete a mental health evaluation, attend therapy, and attend a sex abuse education class. Our review of the record on appeal shows that the trial court's relevant findings of fact were supported by testimony and other evidence and support its conclusion that Grandmother has failed to make reasonable progress and its elimination of reunification as a permanent plan.

*A. Therapy*

Grandmother argues that the evidence did not support a finding that she did not complete mental health services as directed in the court's previous permanency planning orders. She argues that she continued to engage in therapy with her regular therapist and that while she never engaged in Dialectical Behavior Therapy (DBT), her failure to do so was not willful. A review of the obligations imposed by the trial

court's orders and Grandmother's efforts to fulfill those obligations is helpful in evaluating the trial court's findings.

In its 16 February 2022 order adjudicating the children abused and neglected, the trial court declined to order Grandmother to participate in mental health treatment. However, DSS developed a case plan in which it requested that Grandmother, among other tasks, obtain a mental health assessment. Though she refused to sign the case plan, she submitted to her first psychological assessment on 30 March 2022, performed by her regular therapist at the UNC Health Pain Management Center. The trial court reviewed this assessment at the 13 April 2022 permanency planning hearing, finding that she had withheld key information from the assessor and ordering that she undergo another evaluation.

Grandmother underwent two subsequent evaluations. The first was conducted in sessions throughout July and August 2022. She underwent a second evaluation in October 2022 as she requested to have her own assessment completed. Each of these evaluations included interviews, psychological testing, and the review of documentary records including court documents from this case. The first evaluation recommended that Grandmother initiate counseling services with a provider experienced in working with personality disorders and noted that Grandmother may benefit from incorporating DBT into her treatment "to help her learn how to perceive things accurately and regulate strong emotions." The second recommended that Grandmother engage in DBT "to improve her interpersonal effectiveness, emotion

regulation, distress tolerance, and ability to focus on current environment." Each recommended that the DBT therapist be given a copy of the respective assessments. The trial court reviewed these evaluations during the 30 November 2022 permanency planning hearing and ordered that Grandmother cooperate with the recommendations made in both reports.

Grandmother testified that she attempted to secure DBT, contacting "probably over 40 different people, institutions," but was unable to secure treatment because none of those providers accepted her health insurance. She ultimately located a DBT provider and underwent an assessment. In an email to DSS, this DBT provider explained that she was not qualified to conduct a "clinical forensic evaluation," which would involve examining past assessments and evaluating the subject over time. Instead, she conducted a "clinical mental health assessment," which did not involve a review of outside documents and was meant to establish "a picture of the client as they present at the time of the assessment." Under these parameters, the provider found that Grandmother did not meet criteria for any diagnosis in the DSM-5 and did not recommend follow-up DBT treatment.

While Grandmother's argument touches on several of the trial court's enumerated factual findings, she ultimately contests the trial court's finding that she "knowingly, willfully and intentionally refused to get DBT services designed to assist her." It is undisputed that Grandmother never obtained DBT as recommended in both

evaluations. However, Grandmother argues that her failure to undergo DBT was not willful, but rather the result of financial difficulties.

At the hearing, the DSS supervisor acknowledged that Grandmother's insurance and financial resources had been an obstacle to obtaining DBT, but detailed the department's efforts to help her arrange therapy. In particular, DSS located a provider who offered services at $40 per session. Grandmother testified that she could not afford this provider for two sessions per month, even with DSS paying half the cost.

The trial court considered Grandmother's testimony and rejected her claim that she could not afford these services. It noted that these costs were low with DSS assistance and that Grandmother continued to pay for cable television. Additionally, the DBT provider Grandmother chose for her assessment charged $100 per hour before DSS assistance. Because evidence supports the trial court's finding that Grandmother could afford DBT, we are bound by that finding. *In re P.O.*, 207 N.C. App. 35, 41, 698 S.E.2d 525, 530 (2010) ("If the trial court's findings of fact are supported by any competent evidence, they are conclusive on appeal.")

Nor did Grandmother's evaluation by the DBT provider satisfy her obligation. Both of Grandmother's evaluations recommending DBT explicitly recommended that the provider be given a copy of those evaluations, and the trial court ordered they be provided to give the DBT practitioner all information relevant to assessing and diagnosing Grandmother. These assessments were made with the assistance of court

filings and included information about Grandmother's denial of any sexual abuse by Father despite the trial court's finding that abuse had occurred—facts that Grandmother had previously failed to disclose in her first psychological evaluation that the trial court found insufficient. Receiving a DBT assessment that did not include a review of these evaluations did not discharge Grandmother's obligation to seek out DBT.[5]

*B. Disengaging from Grandmother's relationship with Father*

The trial court found that Grandmother had failed to disengage from her relationship with her son. The October 2022 psychological assessment recommended that Grandmother "disengage from [Father] in order to show that she is willing to put the needs of her grandchildren over her need to keep an open mind about [his] guilt or innocence." The recommendations of Grandmother's psychological evaluations were incorporated into the 26 January 2023 permanency planning order.

By her own admission, Grandmother has not disengaged from Father:

Q: Do you have—do you have any kind of communication with your son?

A: Yeah, I speak to him every now and then, yeah.

---

[5] Grandmother argues "the evidence is clear that [the DBT provider] would not accept [outside documents]" and that Findings of Fact 69 and 76, finding that "[Grandmother] had not provided [the DBT provider] with the two psychological assessments that the Court had given permission to release to the provider" must therefore be struck. It is uncontested that Grandmother did not provide the DBT provider with outside documentation. We disagree that these findings imply that Grandmother refused to provide documents to a provider who would otherwise review them and decline to strike the findings.

Q: Okay. Do you talk about this case?

A: He doesn't really like to talk about the case, because he hadn't seen his children in so long, and it's stressful.

. . .

Q: You have not disengaged from [Father,] have you?

A: No, my son hasn't even been to criminal court yet. And I know this is a different court, but at this point, it's looking like we weren't even gonna get the kids anyway, so it didn't matter.

Grandmother argues that the directive is too vague, particularly because the court only ordered that she "cooperate with the recommendation of the Psychological evaluation[s]," rather than explicitly ordering that she disengage from Father, and only one of her evaluations included that recommendation. She cites caselaw addressing requirements of clarity in court orders. *Nw. Bank v. Robertson*, 39 N.C. App. 403, 411, 250 S.E.2d 727, 731 (1979); *Spears v. Spears*, 245 N.C. App. 260, 284, 784 S.E.2d 485, 500 (2016) (citing *Morrow v. Morrow*, 94 N.C. App. 187, 189, 379 S.E.2d 705, 706 (1989) ("A judgment must be complete and certain, indicating with reasonable clearness the decision of the court, so that such judgment may be enforced.")). But Grandmother does not appear to be confused by the trial court's directive: when asked if she had disengaged from her son she answered that she had not and testified as to the topics of their conversations.

Moreover, we do not believe these cases, which address final judgments being rendered void for uncertainty, are apposite to this context. Even if Grandmother were

not ordered to disengage from her relationship with Father, choosing to maintain communication with the man who sexually abused a child is relevant to the trial court's decision to allow reunification with that child and her siblings. "In choosing an appropriate permanent plan . . . the juvenile's best interests are paramount." *In re J.H.*, 244 N.C. App. 255, 269, 780 S.E.2d 228, 238 (2015). "The court may consider any evidence . . . that the court finds to be relevant, reliable, and necessary to determine the needs of the juvenile and the most appropriate disposition." N.C. Gen. Stat. § 7B-906.1(c).  Grandmother's admitted maintenance of an ongoing relationship with Father, despite the recommendation of her mental health evaluation, is relevant to the determination of the children's best interests.

This failure to disengage is particularly relevant given that the court's primary concern with returning the children to Grandmother is her refusal to accept that Father sexually abused Holly. Whether or not the trial court clearly ordered her to disengage, continuing to associate with Father is an important consideration in determining if Grandmother can safely parent the children. The trial court did not err in finding that Grandmother failed to disengage from her relationship with Father.

*C. Sex abuse education*

Grandmother argues that the trial court's findings related to her failure to complete sex abuse education are unsupported. The trial court found that Grandmother had failed to follow the recommendations of her psychological

evaluations by refusing to seek educational opportunities to learn about parenting a child who has been the victim of sexual abuse. It also found that she had "never participated" in such parenting courses or related support groups and that she failed to obtain education on parenting "children who have been exposed to other environmental chaos such as parents with a substance abuse problem by participating in support groups or non-offender's education."

Grandmother argues that her completion of the Darkness to Light online course renders these findings unsupported. We agree, to the extent that the trial court found that Grandmother had never participated in parenting courses. However, after her completion of that course, the trial court continued to order that she seek out additional educational opportunities, which she did not do.

Grandmother presented her certificate of completion of the Darkness to Light course on 22 March 2022, following the children's adjudication. In the following permanency planning order, the trial court recognized her completion of this class and noted that she was "compliant" with the DSS recommendation, but still ordered that she "attend sex abuse classes/support groups and receive an assessment to address issues of sexual abuse concerns." Both of Grandmother's psychological evaluations, each performed after her completion of the Darkness to Light course, recommended that she receive additional education regarding parenting a child who has been sexually abused. The next permanency planning order also recognized Grandmother's completion of Darkness to Light, but noted her as only partially

compliant with this DSS recommendation and again ordered she attend sex abuse classes. It is clear that the trial court found Grandmother's completion of Darkness to Light insufficient, as she stated she did not gain any knowledge from the class, and it ordered her, as recommended by DSS and her psychological evaluators, to obtain additional education and counseling. Grandmother does not argue that she did so.

To the extent that the trial court found that Grandmother had completed no sex abuse education, those findings are struck. Its findings that she did not obtain additional education as ordered are, however, supported by competent evidence.

### D. *Ability to see reality*

Grandmother contests the court's findings regarding her ability to see reality. The trial court found that Grandmother's refusal to believe that Father abused Holly "calls into question [her] ability to face reality." It found that she refused to believe "any problem exists in this case," that she would prioritize Father's needs over the children and allow him to have contact with the children, demonstrated a lack of rational judgment, and generally that her testimony indicated she chose to see things as she would like them to be, rather than recognizing reality.

Grandmother argues that "there was no testimony at the hearing that [she] had problems seeing reality" and that one of Grandmother's psychological evaluations stated that she "appears to have good reality testing." This argument ignores the fact that the trial court's findings are based entirely on Grandmother's

consistent refusal to accept the possibility that Father sexually abused Holly. From Holly's initial diagnosis through the final permanency planning hearing, where Grandmother testified that she believed Holly contracted the disease from a toilet seat, that she had gonorrhea "bacteria" but not an infection, and that she would not believe Father had abused Holly even if he were convicted by a jury, Grandmother has rejected the overwhelming evidence of Holly's abuse in favor of unsupported conjecture. The trial court's finding that Grandmother refuses to accept the reality of Holly's abuse is supported by the evidence.

Grandmother also argues that, because she testified that she would still keep Father away from the children despite this belief, the trial court could not have found she could not be a safe caregiver. The trial court's concerns on that front stem not only from Grandmother's inability to accept that Father abused Holly, but because she testified that she would only keep the children away from Father because of the risk of DSS taking custody of the children—not because of the danger represented by Holly's abuser. Additionally, she had prioritized Father's needs over those of the children in the past, most notably by sending the children to live with a relative rather than having Father leave the home.

Even assuming the trial court's belief that Grandmother would allow Father to have contact with the children is unsupported, the danger to the children comes not only from that contact, but from a sexually abused child being raised by a caretaker who does not believe that she was abused and refuses to seek out education

or other assistance in parenting an abused child. The trial court's findings that Grandmother would not be a safe caregiver are supported by the evidence.

*E. Visitation*

Finally, Grandmother contests the trial court's findings regarding her visitation with the children. Grandmother's visitation with the children was indeed largely positive: DSS observed that Grandmother brought the children toys and food, and she got along with the children well. However, the trial court found that Grandmother engaged in conversations with the children about returning home and also spoke to the social worker about the unfairness of the case. These findings were supported by the testimony of the DSS supervisor. The children were present on at least one occasion during which Grandmother asked the supervising social worker a question about the case.

Grandmother argues that the evidence does not support the trial court's finding that her visitation was inappropriate because the majority of the evidence shows that her interactions with the children were appropriate and enriching. But the trial court's findings were supported by evidence of specific inappropriate conversations with the children or the supervising social worker. The trial court did not err in making these findings.

II.   Misapprehensions of law

Grandmother argues that the permanency planning order in this case was insufficient to support the cessation of reunification as a permanent plan because the

trial court misapprehended the law. She argues first that the trial court erred by finding a ground for termination of parental rights, which is inapplicable to the permanency planning process, and second that the trial court inappropriately placed an evidentiary burden upon her.

*A. Termination ground*

Grandmother's argument that the trial court erred by finding an inapplicable termination ground rests in the language used in one of its Findings of Fact. Finding of Fact 122 states:

> [Grandmother's] actions have resulted in the abuse and/or neglect of the minor children [within] the meaning of 7B-101. The children would be at a substantial risk of repetition of abuse and/or neglect if returned to her care now or in the foreseeable future. [Grandmother] has shown this Court her son is her main priority and not the well-being of these Minor Children.

Grandmother argues that this finding reflects the statutory language of the "neglect" ground for terminating parental rights. She seems to argue that the court in effect issued a ruling terminating her parental rights, in a misapprehension of its role at the time without safeguards inherent to the termination process, such as the application of a clear and convincing evidentiary standard. N.C. Gen. Stat. § 7B-1109(f).

It is unclear from Grandmother's briefing which part of this finding is "language directly related to the neglect termination ground," but there appear to be two possibilities.

The first is the trial court's citation of the statutory definitions of abuse and neglect under Section 7B-101, as those definitions are incorporated into our termination statute:

> The court may terminate the parental rights upon a finding . . . the parent has abused or neglected the juvenile. The juvenile shall be deemed to be abused or neglected if the court finds the juvenile to be an abused juvenile within the meaning of G.S. 7B-101 or a neglected juvenile within the meaning of G.S. 7B-101.

N.C. Gen. Stat. § 7B-1111(a). However, the use of Section 7B-101's definitions of abuse and neglect does not imply that the trial court was applying standards more appropriate for a termination context. Section 7B-101 provides definitions for terms used throughout the entirety of the Abuse, Neglect, and Dependency Subchapter of our Juvenile Code. N.C. Gen. Stat. § 7B-101 ("As used in this Subchapter, unless the context clearly requires otherwise, the following words have the listed meanings[.]"). Among other terms, this section defines "abused juvenile" and "neglected juvenile" for use throughout the entire Subchapter, including abuse, neglect, and dependency adjudications. *See, e.g. In re K.L.*, 272 N.C. App. 30, 39, 845 S.E.2d 182, 190 (2020) (citing § 7B-101(1) to define "abused juvenile" when reviewing the adjudication of a minor).

It is also possible that Grandmother takes issue with the trial court's finding that "[t]he children would be at a substantial risk of repetition of abuse and/or neglect if returned to her care now or in the foreseeable future" as language too similar to

that used in termination proceedings. In order to terminate parental rights upon the ground of neglect, a trial court must "consider any evidence of changed conditions in light of the evidence of prior neglect and the probability of a repetition of neglect" and may find the neglect ground if the evidence shows "a likelihood of future neglect by the parent." *In re M.S.E.*, 378 N.C. 40, 48, 859 S.E.2d 196, 205 (2021). But just because the likelihood of future neglect or abuse is relevant to the termination of parental rights does not render it *irrelevant* to a permanency planning ruling, nor does the trial court's consideration of such imply that the trial court is applying an improper standard to its analysis. During a permanency planning hearing, the task of the trial court is to adopt the permanent plans the court finds are in the juvenile's best interest. N.C. Gen. Stat. § 7B-906.2(a). The possibility that a neglected juvenile faces a substantial risk of future neglect upon reunification is a relevant consideration in determining whether reunification is appropriate.

In order to eliminate reunification as a permanent plan, the trial court was required to make written findings "that reunification efforts clearly would be unsuccessful or would be inconsistent with the juvenile's health or safety." N.C. Gen. Stat. § 7B-906.2(b) "As part of that process, the trial court is required to make written findings 'which shall demonstrate the degree of success or failure toward reunification[.]' " *In re L.E.W.*, 375 N.C. 124, 129, 846 S.E.2d 460, 465 (2020) (citing N.C. Gen. Stat. § 7B-906.2(d)). These findings include:

> (1) Whether the parent is making adequate progress

within a reasonable period of time under the plan.

    (2) Whether the parent is actively participating in or cooperating with the plan, the department, and the guardian ad litem for the juvenile.

    (3) Whether the parent remains available to the court, the department, and the guardian ad litem for the juvenile.

    (4) Whether the parent is acting in a manner inconsistent with the health or safety of the juvenile.

N.C. Gen. Stat. § 7B-906.2(d). The trial court does not need to make a verbal recitation of the statutory language, but "the order must make clear that the trial court considered the evidence in light of whether reunification would be futile or inconsistent with the juvenile's health, safety, and need for a safe, permanent home within a reasonable period of time." *In re L.M.T.*, 367 N.C. 165, 167-68, 752 S.E.2d 453, 455 (2013).

    Here, the trial court's order reflects that it made this consideration. It found facts as to each of the Section 906.2(d) factors: that Grandmother remained available to the court, but that she was not participating or cooperating with the plan, nor was she making progress, and was acting in a manner inconsistent with the health and safety of the children. Each of these findings was supported by evidentiary findings, including those regarding her failure to undergo DBT, attend classes on parenting victims of sexual abuse and, most importantly, her refusal to acknowledge the fact that her son had sexually abused Holly. There is no indication the trial court applied an inappropriate standard to its analysis.

Grandmother's own briefing, in its argument on a separate issue, acknowledges the overlapping considerations between termination and permanency planning, identifying our Supreme Court's reliance on termination precedent to affirm an order ending reunification efforts because "[i]t stands to reason that evidence sufficient to support the termination of parental rights is sufficient to support the less dramatic step of removing reunification from a permanent plan." *In re J.M.,* 384 N.C. at 602, 887 S.E.2d at 835. The trial court properly addressed the considerations required to end reunification efforts and did not err by considering the possibility of future neglect when determining the best interests of the children.

*B. Burden shifting*

Grandmother also argues that the trial court impermissibly placed the burden of proof upon her at the permanency planning hearing. During a permanency planning hearing, the court is tasked with determining the best interest of the child. N.C. Gen. Stat. § 7B-906.2(a). Accordingly, "neither the parent nor the county department of social services bears the burden of proof in permanency planning hearings." *In re E.A.C.*, 278 N.C. App. 608, 617, 863 S.E.2d 433, 439 (2021).

In one of its Findings of Fact, the trial court found:

> [Grandmother] failed to obtain educational courses for parenting "children who have been exposed to other environmental chaos such as parents with a substance abuse problem by participating in support groups or non-offender's education." [Grandmother] is unable to provide this Court with any proof she is in a better position than she was over a year and a half ago concerning raising a

child who has been sexually abused and how to provide them with the care and services "they need to ensure their emotional wellbeing." [Grandmother] has not provided any evidence to this Court that she is better positioned now, than a year ago, to help these minor children deal with the trauma they have faced in their lives.

We disagree that the trial court's language here implies that a burden of proof was placed on Grandmother. While the wording is perhaps inartful, it is clear from the context of this finding that the trial court did not place a burden on her. First, the trial court's finding that Grandmother had not provided evidence that she is "better positioned" is in the same paragraph as the finding that she had not obtained educational resources to enable her to parent vulnerable children. This is part of determining whether Grandmother "is making adequate progress within a reasonable period of time under the plan." N.C. Gen. Stat. § 7B-906.2(d)(1). The trial court ordered Grandmother in its two previous permanency planning orders to seek out additional educational resources to assist her in parenting the children. This finding simply acknowledges that she has not done so.

Second, this paragraph is one of the trial court's 124 Findings of Fact detailing the history of the case and Grandmother's participation in it. These findings make clear that the trial court weighed the evidence before concluding that the reasons for the children's removal still existed and that Grandmother had not made sufficient progress in creating a safe environment such that reunification was in the children's best interest. Following each of the three previous hearings—the dispositional

hearing and the two prior permanency planning hearings—the trial court determined that the children were not safe in Grandmother's home because of her unwillingness to accept that Holly had been abused or to participate in education or therapy that would aid in parenting abused or neglected children. The trial court is, in this finding and others, recognizing that sufficient improvement has not been made that would now render the home safe for the children where before it was not.

III.    Removal of reunification from permanent plan

Grandmother argues that she substantially complied with her case plan and that the trial court narrowly focused on a handful of issues, ignoring her overall progress, and erred in ordering the cessation of reunification efforts. We review the trial court's elimination of reunification from the permanent plan for abuse of discretion. *In re J.H.*, 373 N.C. 264, 267-68, 837 S.E.2d 847, 850 (2020). A trial court abuses its discretion when its ruling is so arbitrary it could not have been the result of a reasoned decision. *Id.*

The trial court's binding findings of fact show that Grandmother failed to make sufficient progress on her case plan.  It is true that her visitation with the children was largely positive, she maintained her ongoing therapy sessions with the therapist at her pain management clinic, completed the Darkness to Light program, and took at least an initial step to be evaluated for DBT. However, she failed to make use of the DBT resources provided by DSS to find a provider in compliance with the trial court's orders, seek out adequate education or support in parenting a child who is the

victim of sexual abuse, or disengage from her relationship with Father.

Most importantly, Grandmother continues to insist that Father never sexually abused Holly. This standing alone could be enough to support the trial court's order ceasing reunification. In *In re G.D.C.C.,* our Supreme Court reviewed a similar situation. 380 N.C. 37, 867 S.E.2d 628 (2022). In that case the mother refused to believe her older daughter, Nadina, had been sexually abused by her father. 380 N.C. at 41-42, 867 S.E.2d at 631. The mother maintained that Nadina was making up the allegations, refused to believe she had been sexually abused, and consistently failed to acknowledge her children's special needs resulting from the abuse. *Id.* She also failed to demonstrate any ability to recognize threats to her younger daughter, Galena, despite completing her case plan in its entirety. *Id.* Much like Grandmother in this case, she "failed to acknowledge any concern with her ability to parent and protect the children, failed to accept any responsibility for her actions, and continued to deny that she had done anything wrong." *Id.* "After years of professional, court, and DSS involvement, the issues that led to Galena's removal remained: respondent still could not protect her children from threats and thus could not provide them an environment that was not injurious to their welfare." *Id.* at 42, 867 S.E.2d at 632. Our Supreme Court held this was sufficient for the trial court to find a probability of future neglect and terminate the mother's parental rights to Galena, regardless of the fact that she had completed her case plan. *Id. See also In re D.W.P.*, 373 N.C. 327, 339–40, 838 S.E.2d 396 (2020) (holding that the respondent-mother's inability to

recognize and break patterns of abuse by her fiancé against her child supported a neglect determination, despite the progress made in her parenting plan).[6]

As in those cases, Grandmother refuses to recognize that Holly was the victim of abuse. Despite overwhelming evidence, she rejected the trial court's determination that sexual abuse had occurred and continued to assert, including in her testimony at the final permanency planning hearing, that Holly had contracted gonorrhea from a toilet seat and the misunderstanding that she "had the bacteria but not the infection." Although she claims she would not allow Father access to the children because of the risk DSS would retake custody of them, it is clear that she does not understand or admit the danger Father represents or the harm he has already caused. Like the respondents in *G.D.C.C.* and *D.W.P.,* whatever progress Grandmother has made on her case plan has not been sufficient to allow her to provide a safe home for the children. Additionally, Grandmother has failed to complete aspects of her plan, including obtaining DBT and sexual assault education, designed to help her do so.

The trial court did not abuse its discretion in ordering that reunification efforts be ceased.

IV.  GAL Investigation

---

[6] As discussed above, although both *G.D.C.C.* and *D.W.P.* are cases involving the termination of parental rights, evidence sufficient to support termination is also sufficient to support an order ceasing reunification efforts. *In re J.M.,* 384 N.C. at 602, 887 S.E.2d at 835.

Grandmother argues that the guardian ad litem ("GAL") failed to adequately perform its duties. Grandmother does not appear to have raised this issue before the trial court. "In order to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion[.]" N.C. R. App. P. 10(a)(1). In her reply brief, Grandmother does not argue that this issue was raised, but that it is automatically preserved because it stems from a statutory mandate.

"[W]hen a trial court acts contrary to a statutory mandate . . . the right to appeal the court's action is preserved." *State v. Ashe,* 314 N.C. 28, 39, 331 S.E.2d 652, 659 (1985). Such mandatory statutes are "legislative enactments of public policy which require the trial court to act, even without a request to do so[.]" *State v. Hucks*, 323 N.C. 574, 579, 374 S.E.2d 240, 244 (1988). This exception to the preservation requirement of Rule 10(a) is limited to mandates directed to the trial court either: "(1) by requiring a specific act by the trial judge; or (2) by requiring specific courtroom proceedings that the trial judge has authority to direct[.]" *In re E.D.*, 372 N.C. 111, 119, 827 S.E.2d 450, 456 (2019) (internal citations omitted) (rejecting respondent's argument that inpatient commitment statute's directive that respondent be examined by a physician upon arrival at 24-hour facility is an automatically preserved statutory mandate). In the second category, the statute must leave "no doubt that the legislature intended to place the responsibility on the judge presiding at the trial." *Id.* at 121, 827 S.E.2d at 457 (citing *Ashe*, 314 N.C. at 35, 331 S.E.2d at 657).

Under N.C. Gen. Stat. § 7B-601(a):

> The duties of the guardian ad litem program shall be to
> make an investigation to determine the facts, the needs of
> the juvenile, and the available resources within the family
> and community to meet those needs; to facilitate, when
> appropriate, the settlement of disputed issues; to offer
> evidence and examine witnesses at adjudication; to explore
> options with the court at the dispositional hearing; to
> conduct follow-up investigations to insure that the orders
> of the court are being properly executed; to report to the
> court when the needs of the juvenile are not being met; and
> to protect and promote the best interests of the juvenile
> until formally relieved of the responsibility by the court.

This is a directive to the GAL and does not appear to mandate that the trial judge perform a specific act or direct a courtroom proceeding. The trial court is directly tasked only with appointing the GAL to represent the juvenile. The statute narrates the GAL's responsibilities, rather than making an explicit command to the trial court such as mandating written findings as to the GAL's performance.

However, we have held previously the combination of N.C. Gen. Stat. § 7B-906.1(c), which requires the trial court at a permanency planning hearing to consider information from the GAL, and N.C. Gen. Stat. § 7B-601(a), which lists the GAL's duties, to create a statutory mandate automatically preserving the right of appeal on this issue. *In re J.C.-B.*, 276 N.C. App. 180, 192, 856 S.E.2d 883, 892 (2021). This is in keeping with the best interest of the children as the paramount goal of permanency planning and our observation that the best interest question is "more inquisitorial in nature than adversarial," rendering the production of any competent, relevant

evidence ultimately the responsibility of the trial court. *Ramirez-Barker v. Barker*, 107 N.C. App. 71, 78, 418 S.E.2d 675, 679 (1992).

Upon the filing of a petition alleging a juvenile is abused or neglected, the trial court must appoint a guardian ad litem to represent the juvenile. N.C. Gen. Stat. § 7B-601(a). The guardian ad litem "stands in the place of the minor who is not *sui juris*," *In re J.H.K.*, 365 N.C. 171, 175, 711 S.E.2d 118, 120 (2011), and is tasked with the duties under Section 7B-601(a) noted above, including investigating to determine the facts and the needs of the juvenile and protecting and promoting the juvenile's best interests. The GAL's representation of the juvenile's interests is integral to the process such that the failure to appoint a GAL creates a presumption of prejudice requiring reversal. *In re R.A.H.*, 171 N.C. App. 427, 431, 614 S.E.2d 382, 385 (2005). Failure by the GAL to fulfill their statutory duties may also require reversal. *See In re J.C.-B.*, 276 N.C. App. at 192, 856 S.E.2d at 892.

In this case, the GAL filed written reports with the trial court at the adjudication hearing and each of the three subsequent permanency planning hearings. These reports reflect that the GAL volunteer conducted monthly visits with the children at their foster home and additional monthly phone calls with their foster parents. They include detailed information concerning the health and well-being of the children, including their psychological and physical health, their educational development, their relationships with their foster parents and each other, and their wishes regarding remaining in the foster home. In its report to the court prior to the

permanency planning hearing that is the subject of this appeal, the GAL recommended the court adopt a primary permanent plan of adoption and a secondary permanent plan of guardianship.

Grandmother's criticism of the GAL's performance stems from two primary concerns: first, that the GAL did not maintain adequate communication with Grandmother, and second, that the GAL did not sufficiently investigate the children's wishes.

Grandmother notes that the GAL maintained contact with her following the initial adjudication and placement of the children in her home but argues that the GAL's contact with her was inadequate once the children were removed from her care following the filing of the petition in August 2021. After the petition was filed, the GAL spoke with Grandmother by telephone twice and had no other contact with her.

Beyond Section 7B-601(a)'s listing of the duties of the GAL, we have little guidance as to what constitutes sufficient investigation. Grandmother directs us to the GAL Attorney Practice Manual published by our Administrative Office of the Courts, which instructs GAL volunteers to "interview parents and family members." In *R.A.H.* we held there was a presumption of prejudice when a GAL was not appointed prior to a termination hearing as that meant no field investigation had been performed, and neither the child nor the respondent-mother had been interviewed prior to the hearing. 171 N.C. App. at 431, 614 S.E.2d at 385 (2005).

Unlike in that case, the GAL here not only had consistent contact with the

children but spoke with Grandmother: twice by phone following the removal of the children from her home, and, as Grandmother describes, on numerous occasions prior to that. These included at least three home visits during which the GAL had the opportunity to see Grandmother interact with the children. The GAL also had access to DSS reports noting that Grandmother's visitation with the children was largely positive.

Moreover, Grandmother makes no argument as to the effect additional contact with her would have had on the GAL's determination of the children's best interests, and we cannot identify any way its recommendation was prejudiced by the lack of additional conversation. More contact would not have changed the fact that Grandmother, as the GAL flags for the trial court's attention, "continues to contest the allegations in the petition" and "stated under oath during the recent TPR hearing that she believed [Holly] contracted gonorrhea by sliding down a toilet seat that was contaminated."

Grandmother also argues that the GAL failed to adequately investigate the children's wishes as to where they would like to live, comparing this case to our decision in *In re J.C.-B.* "One of the duties of a GAL is to ascertain from the child they represent what their wishes are and to convey those express wishes accurately and objectively to the court." *In re J.C.-B.,* 276 N.C. App. at 192, 856 S.E.2d at 892.

*J.C.-B.* is distinguishable from this case. In that case, the sixteen-year-old juvenile, Jacob's, visitation with his mother was at issue. The GAL provided the trial

court with letters from therapists giving conflicting advice: two expressed the opinion that Jacob should not be allowed contact with his mother, while the most recent recommended Jacob be allowed to decide when he would like to resume visitation. *Id.* at 193-94, 856 S.E.2d at 892. The GAL did not communicate Jacob's wishes to the trial court, which ordered no visitation with the mother "until recommended by the juvenile's therapist." *Id* at 183, 856 S.E.2d at 887. We held that the GAL had failed to adequately investigate Jacob's wishes and convey them to the trial court. *Id*. at 194, 856 S.E.2d at 893.

Rather than providing sufficient evidence for the trial court to determine whether visitation was in Jacob's best interest, the GAL simply provided the court with conflicting recommendations from therapists—including one that recommended deferring to Jacob's wishes—with no indication the GAL had asked his preference. The trial court then vested discretion in one of the therapists to determine when visitation was appropriate, meaning that not only did the GAL fail to properly investigate, but the trial court improperly delegated its authority. *Id.*

In this case, the GAL did investigate the children's wishes, finding that Holly and Thomas both loved their foster family and loved living in their foster home, and that Mary was too young to express her wishes. While Grandmother argues the GAL should have more granularly investigated whether the children wished to return to her care, we do not believe the GAL was required to do so nor do we believe that information was necessary to the trial court's decision. In *J.C.-B.* the juvenile was

sixteen years old (as we note in that case, approaching the age of majority), the record reflected an expressed desire in the past to maintain contact with his mother, and one of his therapist's letters explicitly recommended that he be allowed to decide whether to resume visitation. 276 N.C. App. at 194, 856 S.E.2d at 892-93. The trial court did not have sufficient evidence to determine Jacob's visitation, information which the GAL should have conveyed.

Here, the children are significantly younger and have expressed their wishes regarding their current home. There are no conflicting recommendations by service providers requiring more detailed information from the children. The trial court had sufficient evidence to make its ruling. Even if the children had expressed a desire to return to live with Grandmother, "[t]he expressed wish of a child of discretion is . . . never controlling upon the court, since the court must yield in all cases to what it considers to be for the child's best interests, regardless of the child's personal preference." *Clark v. Clark*, 294 N.C. 554, 576-77, 243 S.E.2d 129, 142 (1978). A statement from a 2-, 4-, or 6-year-old that they would like to live with Grandmother, who continues to deny that the oldest was sexually assaulted, would not have changed the trial court's decision as to the children's best interest in this case.

V.    Reasonable efforts of DSS

Grandmother last argues that DSS did not make reasonable efforts toward reunification in that it did not provide adequate visitation or help in obtaining DBT. Although DSS argues that Grandmother also failed to argue this issue before the trial

court and preserve it for appeal, the trial court was required to make related findings

and conclusions:

> Unless reunification efforts were previously ceased, at each permanency planning hearing the court shall make a finding about whether the reunification efforts of the county department of social services were reasonable. In every subsequent permanency planning hearing held pursuant to G.S. 7B-906.1, the court shall make written findings about the efforts the county department of social services has made toward the primary permanent plan and any secondary permanent plans in effect prior to the hearing. The court shall make a conclusion about whether efforts to finalize the permanent plan were reasonable to timely achieve permanence for the juvenile.

N.C. Gen. Stat. § 7B-906.2(c). Accordingly, we consider whether the trial court's

findings of fact support its conclusion that "[t]he Alamance County Department of

Social Services has made reasonable efforts to eliminate the need for removal of the

juveniles[.]" *In re A.P.*, 281 N.C. App. 347, 354, 868 S.E.2d 692, 698 (2022).

"Our General Assembly requires social service agencies to undertake

reasonable, not exhaustive, efforts towards reunification." *In re A.A.S.,* 258 N.C. App.

422, 430, 812 S.E.2d 875, 882 (2018). "Reasonable efforts" are the "diligent use of

preventive or reunification services by a department of social services when a

juvenile's remaining at home or returning home is consistent with achieving a safe,

permanent home for the juvenile within a reasonable period of time." N.C. Gen. Stat.

§ 7B-101(18).

The trial court, in its Finding of Fact 21, found that DSS's reasonable efforts

to achieve reunification included, among other services: assessing the children's needs, contacting providers, counseling and supporting the family, meeting with Grandmother to develop a service agreement and visitation plan, providing monetary assistance for the children's care, and making referrals to service providers. Grandmother does not contest this finding but argues that DSS failed to provide reasonable efforts in that it did not expand her visitation or provide adequate assistance in obtaining DBT.

In its adjudication and disposition order, filed 16 February 2022, the trial court ordered that DSS provide Grandmother with one hour of monthly visitation with the children. In its subsequent orders, filed 18 May 2022 and 26 January 2023, the trial court continued to order one hour of monthly visitation, but gave DSS discretion to increase visitation. Grandmother argues that the failure of DSS to do so, despite visitation going well was "insufficient reasonable effort toward [Grandmother's] visits with her grandchildren." Grandmother's argument ignores DSS's stated concerns about her behavior at visitation, including bringing the case up with the attending social worker and asking the children if they wanted to come home. It also ignores DSS testimony that Grandmother's visits were routinely allowed to last longer than the scheduled hour. While a failure to provide court-ordered visitation may impact a reasonable efforts determination, *see In re C.C.G.*, 380 N.C. 23, 35, 868 S.E.2d 38, 47 (2022), we do not hold that DSS exercising its discretion and declining to expand visitation beyond that required by the trial court amidst concerns about

Grandmother's behavior during visits was a failure to exercise reasonable efforts toward reunification.

Grandmother's briefing also suggests offhand that the trial court improperly delegated control over visitation. However, allowing DSS to expand visitation beyond a minimum ordered by the trial court is not an impermissible delegation of judicial authority. *In re K.W.*, 272 N.C. App. 487, 495, 846 S.E.2d 584, 591 (2020).

Nor were DSS's efforts to assist Grandmother in obtaining DBT insufficient. As discussed above, DSS contacted multiple providers on Grandmother's behalf and offered to pay for half the cost of services. While Grandmother testified that she could not afford DBT sessions as none of the suggested providers accepted her insurance and would cost a hundred dollars or more each session, DSS located a provider that would cost $40 per session and offered to pay half of that fee. The trial court rejected Grandmother's testimony that she could not afford $40 per month to attend bi-weekly sessions and found that she willfully refused to engage in mental health treatment. DSS made reasonable efforts to assist Grandmother, but she rejected its assistance.

## Conclusion

For the foregoing reasons, we affirm the trial court's permanency planning order ceasing reunification efforts.

AFFIRMED.

Judges ZACHARY and THOMPSON concur.